UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, <br> U.S. Attorney's Office <br> 555 Fourth Street, NW <br> Washington, DC 20530, <br><br>         Plaintiff, <br><br>     v. <br><br> $4,083,935.00 OF FUNDS ASSOCIATED <br> WITH DANDONG CHENGTAI TRADING <br> LIMITED, <br><br>         Defendant In Rem, and <br><br> DANDONG ZHICHENG METALLIC <br> MATERIAL CO., LTD <br> A/K/A DANDONG CHENGTAI TRADING <br> CO. LTD., <br> A/K/A DANDONG CHENGTAI TRADE CO. <br> LTD., <br> RM. 1801, NO. 96 JINJIANG ST., <br> DANDONG, LIAONING PROVINCE, <br> CHINA <br><br> RAMBO RESOURCE LIMITED, <br> A/K/A TIN YEE RESOURCES LIMITED, <br> ROOM 907, JDL 125, WING TUCK <br> COMMERCIAL CENTRE, 177-183 WING <br> LOK STREET, HONG KONG, CHINA <br><br> RUIZHI RESOURCES LIMITED, <br> ROOM 1302, NUMBER 298 JIANGCHENG <br> DANDONG, LIAONING PROVINCE, <br> CHINA <br><br> SHUN MAO MINING CO., LIMITED, <br> RM. 1801, NO. 96 JINJIANG ST., <br> DANDONG, LIAONING PROVINCE, <br> CHINA | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br> Civil Action No. _____ |

_____  )

| | |
|---|---|
| MAISON TRADING  LIMITED,<br>TRUST COMPANY COMPLEX,<br>AJELTAKE ISLAND, MAJURO, REPUBLIC<br>OF THE MARSHALL ISLANDS, MH<br><br>CHI YUPENG,<br>RM. 1801, NO. 96 JINJIANG ST.,<br>DANDONG, LIAONING PROVINCE,<br>CHINA<br>                              Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## VERIFIED COMPLAINT FOR FORFEITURE *IN REM* AND CIVIL COMPLAINT

COMES NOW, Plaintiff, the United States of America, by and through the United States Attorney for the District of Columbia, and brings this verified complaint for forfeiture in a civil action *in rem* against $4,083,935.00 associated with Dandong Chengtai Trading Limited (the "Defendant Funds"), which is in the possession of the U.S. government, and civil complaint *in personam* against: Dandong Zhicheng Metallic Material Co., Ltd ("Dandong Zhicheng") (a/k/a Dandong Chengtai Trading Co. Ltd.) (a/k/a Dandong Chengtai Trade Co. Ltd.) (collectively "Dandong Chengtai"); Rambo Resource Limited ("Rambo Resource") (a/k/a Tin Yee Resources Limited ("Tin Yee Resources")); Ruizhi Resources Limited ("Ruizhi Resources"); Shun Mao Mining Co., Limited ("Shun Mao Mining"); Maison Trading Limited ("Masion Trading"); and Chi Yupeng (collectively, the "Defendant Entities") and alleges as follows:

## NATURE OF ACTION AND THE DEFENDANTS *IN REM* AND *IN PERSONAM*

1.     This action arises out of an investigation by the Federal Bureau of Investigation ("FBI") of a scheme by Dandong Chengtai -- which is sanctioned by the U.S. Department of the Treasury -- to launder U.S. dollars through the United States on behalf of sanctioned entities in the Democratic People's Republic of Korea ("DPRK" or "North Korea") via the sale of coal.

2.     As described in detail below, sanctioned North Korean entities have conspired with Dandong Chengtai and related front companies in order to access the U.S. financial system and

evade the U.S. sanctions to benefit the Workers Party of Korea, Office 39, and the North Korean military.

3.    This action relates to millions of U.S. dollar that Dandong Chengtai and related front companies remitted to each other as well as third parties.

4.    Specifically, Dandong Chengtai wired $4,083,935.00 to a related front company, Maison Trading, which funds were routed through U.S. correspondent banking accounts, and which comprise the Defendant Funds.

5.    The laundering of the Defendant Funds was in violation of the International Emergency Economic Powers Act ("IEEPA"), codified at 50 U.S.C. § 1701 *et seq*., the prohibitions of the North Korea Sanctions and Policy Enhancement Act of 2016 ("NKSPEA"), codified at 22 U.S.C. § 9201 *et seq*., the conspiracy statute, codified at 18 U.S.C. § 371, and the federal money laundering statute, codified at 18 U.S.C. §§ 1956(a)(2)(A), (a)(2)(B)(i), (h).

6.    The Defendant Funds are subject to forfeiture pursuant to: 18 U.S.C. § 981(a)(1)(C); 18 U.S.C. § 981(a)(1)(I); and 18 U.S.C. § 981(a)(1)(A).

7.    The Defendant Funds are subject to a money laundering monetary penalty pursuant to 18 U.S.C. § 1956(b).

## JURISDICTION AND VENUE

8.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1355.

9.    Venue is proper pursuant to 28 U.S.C. §§ 1355(b)(1)(A) and 1391(b)(2) because the acts and omissions giving rise to the forfeiture took place in the District of Columbia. The Defendant Funds are currently held in a bank account in the United States. The Defendant Entities and co-conspirators failed to seek or obtain licenses from the Department of the Treasury's Office of Foreign Asset Control ("OFAC"), which is located in Washington, D.C., for conducting transactions with these funds, for which licenses were required under United States law.

10.     Dandong Chengtai (a/k/a Dandong Zhicheng), Rambo Resource, and Ruizhi Resources are corporations headquartered in China. As detailed herein, Dandong Chengtai (a/k/a Dandong Zhicheng), Rambo Resource, and Ruizhi Resources purposefully directed their illicit actions towards the United States by routing funds through bank accounts located in this country.

11.     Maison Trading is a corporation purportedly headquartered in the Marshall Islands. As detailed herein, Maison Trading purposefully directed its illicit actions towards the United States by routing funds through bank accounts located in this country.

12.     Chi Yupeng is a Chinese national who resided in China. As detailed herein, Chi Yupeng purposefully directed his illicit actions towards the United States by directing his companies to rout funds through bank accounts located in this country

## STATUTORY FRAMEWORK

## I.     THE INTERNATIONAL EMERGENCY ECONOMIC POWERS ACT

13.     This investigation relates to violations of regulations issued pursuant to IEEPA. By virtue of IEEPA, the President of the United States was granted authority to deal with unusual and extraordinary threats to the national security and foreign policy of the United States. *See* 50 U.S.C. §§ 1701, 1702. Pursuant to that authority, the President and the executive branch have issued orders and regulations governing and prohibiting certain transactions, including financial transactions, with North Korea by U.S. persons or involving U.S.-origin goods.

14.     Pursuant to 50 U.S.C. § 1705(a), "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this chapter," and pursuant to Section 1705(c), "[a] person who willfully commits, willfully attempts to commit, or willfully conspires to commit, or aids or abets in the commission of, an unlawful act described in subsection (a) of this section shall" be guilty of a crime. 18 U.S.C. § 371 criminalizes a conspiracy to commit offenses against the United States.

15.     On November 14, 1994, pursuant to IEEPA, the National Emergencies Act, and the Arms Export Control Act, the President issued Executive Order ("E.O.") 12938 finding that "the proliferation of nuclear, biological and chemical weapons ('weapons of mass destruction') and of the means of delivering such weapons, constitutes an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States, and [declaring] a national emergency to deal with that threat."

16.     By the authority vested in the President by IEEPA and the National Emergencies Act, on or about June 28, 2005, the President signed Executive Order ("E.O.") 13382, which takes additional steps with respect to the national emergency described and declared in E.O. 12938, to target proliferators of weapons of mass destruction ("WMD") and their support networks and deny designated WMD proliferators access to the U.S. financial and commercial system. As part of E.O. 13382, a number of North Korean entities were identified by the President as WMD proliferators and listed in the Annex to E.O. 13382 as being subject to U.S. sanctions. This blocking program initially applied to eight organizations in North Korea, Iran, and Syria

17.     On April 13, 2009, the U.S. Department of the Treasury ("Treasury") promulgated the Weapons of Mass Destruction Proliferators Sanctions Regulations, 31 C.F.R. §544.101, et seq., (the "WMDPSR"), which blocked, as a function of law, any property and interests of property, belonging to individuals and entities listed in or designated pursuant to E.O. 13382, who were concurrently placed on Treasury's Office of Foreign Assets Control's ("OFAC"). Specially Designated Nationals and Blocked Persons List (the "SDN list"), see 31 C.F.R. §544.201(a). The terms "property" and "property interests" include but are not limited to money, bank deposits, guarantees, and other financial instruments. *See* 31 C.F.R. §544.308.

18.     Pursuant to 31 C.F.R. § 544.405, no U.S. person may provide financial or other services for the benefit of a person or entity added to the SDN list pursuant to the authorities provided by E.O. 13382, except as authorized or licensed by OFAC. Additionally, a non-U.S. person may not cause the provision of financial or other services by a U.S. person for the benefit of a person or entity so designated under these sanctions, except as authorized or licensed by OFAC. *See* 31 C.F.R. § 544.405; 50 U.S.C. § 1705.

19.     In August 2010, OFAC designated Office 39 pursuant to E.O. 13551. In March 2016, E.O. 13722 blocked the Workers' Party of Korea.

## II.     THE NORTH KOREA SANCTIONS AND POLICY ENHANCEMENT ACT OF 2016

20.     On February 18, 2016, President Obama signed into law the NKSPEA.

21.     Within the NKSPEA, Congress found that "[t]he Government of North Korea has been implicated repeatedly in money laundering . . . ." 22 U.S.C. § 9201(a)(3).

22.     NKSPEA states that the President "shall designate" any person that:

a.      "knowingly, directly or indirectly, engages in money laundering . . . that supports the Government of North Korea or any senior official or person acting for or on behalf of that Government." 22 U.S.C. § 9214(a)(6); or

b.      "knowingly, directly or indirectly, sells, supplies, or transfers to or from the Government of North Korea or any person acting for or on behalf of that Government, a significant amount of precious metal, graphite, raw or semi-finished metals or aluminum, steel, coal, or software, for use by . . . the Korean Workers' Party . . . ." 22 U.S.C. § 9214(a)(8).

III.    **BANK SECRECY ACT CRIMINALIZES CORRESPONDNET BANKING WITH NORTH KOREAN FINANICAL INSTITUTIONS**

23.     According to the U.S. Department of the Treasury ("Treasury Department"), the global financial system, trade flows, and economic development rely on correspondent banking relationships. To protect this system from abuse, U.S. financial institutions must comply with national anti-money laundering requirements set forth in the Bank Secrecy Act as well as sanctions programs administered by OFAC. The Financial Crimes Enforcement Network ("FinCEN") is responsible for administering the Bank Secrecy Act in furtherance of its mission to safeguard the U.S. financial system from illicit use.

24.     Nearly all U.S. dollar transactions conducted by foreign financial institutions are processed via correspondent bank accounts in the United States. Correspondent bank accounts are broadly defined to include any account established for a foreign financial institution to receive deposits from, or to make payments or disbursements on behalf of, the foreign financial institution, or to handle other financial transactions related to such foreign financial institution. *See* 31 C.F.R. § 1010.605. The Bank Secrecy Act requires U.S. financial institutions to take anti-money laundering measures for foreign financial institutions engaged in correspondent banking of U.S. dollar transactions.

25.     The Bank Secrecy Act broadly defines foreign financial institutions to include dealers of foreign exchange and money transmitters in a manner not merely incidental to their business. *See* 31 C.F.R. 1010.605(f).

26.     Section 311 of the USA PATRIOT Act, codified at 31 U.S.C. § 5318A as part of the Bank Secrecy Act, gives FinCEN a range of options, called special measures, that can be adapted to target specific money laundering and terrorist financing concerns. A Section 311 finding and the related special measure are implemented through various orders and regulations

incorporated into 31 C.F.R. Chapter X. In order to protect the integrity of the U.S. financial system, a special measure imposed under Section 311 prevents financial institutions from causing U.S. financial institutions from engaging in any type of financial transaction with an entity within the jurisdiction deemed an area of money laundering concern.

27.     In May 2016, FinCEN made a Section 311 finding against North Korea. Specifically, FinCEN's finding deemed *the entire North Korean financial sector* as a jurisdiction of primary money laundering concern. *See* Federal Register, Vol. 81, No. 107 (June 3, 2016).

28.     In November 2016, FinCEN implemented the most severe special measure against the entire North Korean financial sector. *See* Federal Register, Vol. 81, No. 217 (November 9, 2016); 31 CFR 1010.659. The special measure bars U.S. financial institutions from maintaining a correspondent account for any North Korean financial institution or any party acting on its behalf. The special measure also requires covered financial institutions to take reasonable steps to not process a transaction for the correspondent account of a foreign bank in the United States if such a transaction involves a North Korean financial institution. Because of the finding that the entire North Korea financial sector was a primary money laundering concern, FinCEN cut all North Korean financial institutions – and entities acting on their behalf – off from any trade in U.S. dollar transactions via correspondent banking. One expert described the effect of such action is to cut the target off from trade in dollars, isolating it from worldwide business.

29.     A violation of the Section 311 finding, codified at 31 U.S.C. § 5318A, or of the regulations published at 31 C.F.R. § 1010.659, is punishable criminally pursuant to 31 U.S.C. § 5322.

**IV.     MONEY LAUNDERING VIOLATIONS**

30.     18 U.S.C. § 1956(h) criminalizes a conspiracy to violate § 1956.

31.     18 U.S.C. § 1956(a)(2)(A) (the international promotional money laundering statute) criminalizes transporting, transmitting, and transferring, and attempting to transport, transmit, and transfer a monetary instrument or funds to a place in the United States from or through a place outside the United States with the intent to promote the carrying on of specified unlawful activity.

32.     Pursuant to 18 U.S.C. § 1956(c)(7)(A), the term "specified unlawful activity," includes violations of 18 U.S.C. § 1343 (relating to wire fraud) and 18 U.S.C. § 1344 (relating to bank fraud).

a.     As noted above, U.S. financial institutions are barred, pursuant to the section 311 special measure, from engaging in financial transactions with North Korean financial institutions. As the FinCEN finding noted, North Korea makes "extensive use of deceptive financial practices, including the use of shell and front companies to obfuscate the true originator, beneficiary, and purpose behind its transactions," in part "to evade international sanctions." *See* Federal Register, Vol. 81, No. 217 at 78716, 78718. North Korean financial institutions have attempted to circumvent the section 311 ban by using foreign front companies to engage in financial transactions on their behalf. These financial transactions would be in violation of NKSPEA, if the parties openly acknowledged the involvement of the North Korea entities. Instead, the true North Korean counterparties to these transactions remain concealed in order to allow the U.S. dollars to be processed.

b.     This constitutes wire fraud, as the false transactions occur via wire, and are done in part to defraud the U.S. Treasury department, which has forbidden such transactions.

c.     This also constitutes wire fraud and bank fraud, as the false transactions occur via wire, and are done in part to defraud U.S. financial institutions, which are barred

from conducting such transactions, and could face civil and criminal penalties for not detecting these transactions.

       d.      But for this scheme to defraud U.S. correspondent banks, North Korean foreign financial institutions would not be able to engage in U.S. dollar transactions.

33.     Pursuant to 18 U.S.C. § 1956(c)(7)(D), the term "specified unlawful activity," includes violations of IEEPA (including violations of any license, order, regulation, or prohibition issued under IEEPA), and offenses under section 104(a) of NKSPEA (relating to prohibited activities with respect to North Korea).

       a.      One of the primary means U.S. financial institutions use to comply with national anti-money laundering procedures is through regular consultation of OFAC's SDN list. The SDN list contains a number of persons (individuals and entities) designated under OFAC's Non-Proliferation Sanctions and North Korea Sanctions programs, including North Korean weapons trading firms, North Korean Government officials, North Korean financial institutions, and nationals of other foreign countries supporting North Korea's weapons of mass destruction programs.

       b.      Criminals are aware of the SDN list and the fact that U.S. financial institutions are obligated to conduct due diligence of their clients in order to prevent sanctioned parties from transacting in U.S. dollars. As a result, sanctioned entities and their co-conspirators employ front companies to engage in laundered transactions on their behalf as a way to prevent banks from learning about their involvement in the transactions.

       c.      North Korean financial facilitators in particular are aware of these designation lists and of U.S. financial institutions' due diligence obligations. In turn, these North Korean entities have a documented practice of using front companies to avoid the

imposition of designations and blockings, which may occur pursuant to IEEPA and NKSPEA. These opaque U.S. dollar transactions by front companies promote IEEPA and NKSPEA violations. That is, if the transactions were not conducted in a fashion to conceal the involvement of the North Korean entities, the transactions would meet the criteria for designation of the involved parties. But, because the parties conceal their laundering of funds, in this instance for the benefit of the North Korean government and their coal sales to benefit the Workers Party, designations are impeded. Financial transactions by North Korean financial facilitators thus facilitate a conspiracy to circumvent designations under IEEPA and NKSPEA.

## V.      FORFEITURE

34.     Pursuant to 18 U.S.C. § 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of IEEPA is subject to civil forfeiture.

35.     Pursuant to 18 U.S.C. § 981(a)(1)(I), any property, real or personal, that is involved in a violation or attempted violation, or which constitutes or is derived from proceeds traceable to a prohibition imposed pursuant to section 104(a) of NKSPEA, is subject to civil forfeiture.

36.     Pursuant to 18 U.S.C. § 981(a)(1)(A), any property, real or personal, involved in a transaction or attempted transaction, in violation of 18 U.S.C. § 1956, or any property traceable to such property, is subject to civil forfeiture.

37.     Forfeiture pursuant to violations of the above money laundering statute and NKSPEA apply to a larger class of property than forfeiture under 18 U.S.C § 981(a)(1)(C), because such forfeitures are not limited to proceeds of the crime. Rather, these forfeitures include property "involved in" the crime or the attempted crime, which can include "clean" or "legitimate" money that is commingled with "tainted" money derived from illicit sources.

## VI.    MONETARY PENALTY

38.    Pursuant to 18 U.S.C. § 1956(b), whoever conducts or attempts to conduct a transaction described in § 1956 (a)(1) or (a)(3), or a transportation, transmission, or transfer described in § 1956(a)(2), is liable to the United States for a civil penalty of not more than the greater of the value of the property, funds, or monetary instruments involved in the transaction or $10,000.

## FACTUAL ALLEGATIONS

## I.    BACKGROUND ON NORTH KOREAN MONEY LAUNDERING

### A.    ILLICIT    NORTH    KOREAN    USE    OF    CORRESPONDENT BANKING CHANNELS

39.    The focus of the investigation is the money laundering activities of unsanctioned financial facilitators located outside of North Korea to benefit entities in North Korea for the purpose of advancing procurement and financial activity benefiting the government of North Korea in contravention of U.S. and United Nations prohibitions on such activity ("North Korean financial facilitators").

40.    The United States House of Representatives' Foreign Affairs Committee released a report which concluded that North Korea remains dependent on its access to the international financial system, which in turn reflects a dependency on the U.S. dollar. *See* House Rept. 114–392, at 18 (January 11, 2016). This is because "[t]he vast majority of international transactions are denominated in dollars, the world's reserve currency." *Id.* North Korea continues to transact in U.S. dollars for many of its international and domestic business transactions, by hiding "its dollar transactions within the dollar-based financial system using false names, shell companies, and other deceptive practices." *Id.*

41.     Designated North Korean companies continue to transact in U.S. dollars via front companies. The United Nations Panel of Experts ("Panel of Experts") noted that transactions originating in foreign banks have been processed through correspondent accounts in the United States via front companies, which are "often registered by non-nationals, who also use indirect payment methods and circuitous transactions dissociated from the movement of goods or services to conceal their activity." 2016 Report of the Panel of Experts, at 62. North Korean front companies are instructed to strip all information tying their U.S. dollar transactions to North Korea, in order to prevent the Treasury Department from blocking the transactions. *Id.* at 66.

42.     This use of front companies was recently highlighted by the Panel of Experts. The report stated that:

> The financial sanctions notwithstanding, the Democratic People's Republic of Korea continues to gain access to and exploit the global international financial system (including banking and insurance) through reliance on aliases, agents, foreign individuals in multiple jurisdictions, and a long-standing network of front companies and embassy personnel, all of which support illicit activities through banking, bulk cash and trade.

United Nations Security Council's February 24, 2016 Report of the Panel of Experts, at 62.

43.     North Korean financial facilitators frequently establish and maintain offshore U.S. dollar accounts for the purposes of remitting wire transfers denominated in U.S. dollars on behalf of sanctioned North Korean entities and their related front companies. *See e.g.* Federal Register, Vol. 81, No. 107 at 35442 ("While none of North Korea's financial institutions maintain correspondent accounts with U.S. financial institutions, North Korea does have access to the U.S. financial system through a system of front companies, business arrangements, and representatives that obfuscate the true originator, beneficiary, and purpose of transactions. We assess that these deceptive practices have allowed millions of U.S. dollars of North Korean illicit activity to flow

through U.S. correspondent accounts."). These U.S. dollar wire transfers originate from financial institutions located outside the United States, which clear through established correspondent banking relationships to U.S. financial institutions in the United States.

44.     Once the wire transfers are cleared through the U.S. financial institutions, payments are transmitted to offshore U.S. dollar accounts maintained by front companies on behalf of the foreign financial institutions and the North Korean entities and/or parties from whom the North Korean sanctioned entities are seeking goods.

B.     COAL COMPANIES ACT AS NORTH KOREAN FOREIGN FINANCIAL FACILITATORS FOR THE BENEFIT OF SANCTIONED ENTITIES

45.     As noted by OFAC, North Korea generates a significant share of the money it uses to fuel its nuclear and ballistic missile programs by mining natural resources and selling those resources abroad. In particular, coal trade has generated over $1 billion in revenue per year for North Korea, activity which prompted the U.N. Security Council to seek to sharply curtail such exports in November 30, 2016, and then to fully ban them in August 5, 2017.

46.     North Korea's biggest market for coal – and thus one of its largest sources of foreign currency – is China, which imports millions of tons of coal annually.

47.     On August 22, 2017, OFAC designated three Chinese coal companies collectively responsible for importing nearly half a billion dollars' worth of North Korean coal between 2013 and 2016. Dandong Zhicheng (a/k/a Dandong Chentgai) was one of the designated companies. The designation noted that Dandong Zhicheng (a/k/a Dandong Chentgai) sold, supplied, transferred, or purchased coal or metal, directly or indirectly, from North Korea, and that the revenue may have benefitted the nuclear or ballistic missile programs of the Government of North Korea or the Workers' Party of Korea (described below). The designation also noted that Dandong Zhicheng specializes in the import, export, and transport of steel and anthracite coal, and that it has worked

with a number of U.S.-designated entities, including the U.S.-designated Koryo Credit Development Bank and Korea Ocean Shipping Agency. Dandong Zhicheng allegedly used the foreign exchange received from the end users of North Korean coal to purchase other items for North Korea, including nuclear and missile components.

48.      Prior designations of coal companies by OFAC similarly noted that coal sales from North Korea benefitted the Workers' Party of Korea. Additionally, the Panel of Experts recently reviewed how another leading exporter of coal from North Korea was a front company for North Korea's Reconnaissance General Bureau. *See* 2017 Report of the Panel of Experts, at 39. In August 2010, OFAC designated the Reconnaissance General Bureau for its work as North Korea's primary intelligence organization and for its involvement in the arms trade, as well as for collecting intelligence for North Korea's Armed Forces.

## II.    TARGET FOREIGN FINANICAL FACILITATOR: THE CHI YUPENG NETWORK OF COMPANIES

### A.    BACKGROUND ON CHI YU PENG NETWORK OF COMPANIES

49.      The investigation focuses on the use of unsanctioned financial facilitators located outside of North Korea who act as foreign financial institutions to benefit sanctioned entities in North Korea for the purpose of advancing procurement and financial activity benefiting the government of North Korea in contravention of U.S. and United Nations prohibitions on such activity ("North Korean financial facilitators"). The subject North Korean financial facilitators are identified as:

a.      Dandong Zhicheng (a/k/a Dandong Chengtai);

b.      Rambo Resource (a/k/a Tin Yee Resources);

c.      Ruizhi Resources;

d.      Shun Mao Mining; and

e.    Maison Trading

(collectively "Chi Yupeng Network of Companies") that are part of a criminal network managed by Chi Yupeng, the majority owner of Dandong Zhicheng (a/k/a Dandong Chengtai). The city of Dandong, China is on the North Korea-China border and is separated from North Korea by the Yalu River.

50.    Corporate filings reveal that Chinese national Chi Yupeng ("Chi") established Dandong Zhicheng in 2005 and owns 90 percent of Dandong Zhicheng's shares. Chi serves as Dandong Zhicheng's (a/k/a Dandong Chengtai's) chairman and majority shareholder. Chi's wife, Chinese national Zhang Bing ("Zhang"), is Dandong Zhicheng's manager.

51.    Chi and Zhang have established and conducted business using numerous front companies, including but not limited to Tin Yee Resources, Rambo Resource, Ruizhi Resources, and Shun Mao Mining. The establishment and use of multiple companies by the same owners/managers to facilitate business transactions is one of the primary methods used by North Korean financial facilitators and other proliferation subjects. The utilization of multiple companies allows North Korean financial facilitators to divert attention, avoid scrutiny, and launder money, all while providing North Korean financial facilitators with options in the event one of their companies is compromised through investigation. The companies can be used interchangeably or for a specifically designed purpose and frequently share addresses, telephone numbers, employees, and transactions with similar business partners.

52.    Dandong Zhicheng's website and its Alibaba page were removed and/or are no longer accessible.[1] Prior to being removed, Dandong Zhicheng's Alibaba webpage, indicated that Dandong Zhicheng primarily dealt in coal, briquette coal, and graphite. Dandong Zhícheng

---

[1] Alibaba is one of the largest e-commerce websites in the world. It is headquartered in China.

advertised that: "We are professional company of trading the North Korea Briquettes, choose us, trust us." Postings on March 18, 2017, prior to the removal of Dandong Zhicheng's Alibaba page, advertised the sale of North Korean coal in U.S. dollars.

53.     Prior to being removed, Dandong Zhicheng's website, www.zhichengsteel.cn revealed that the company was one of the largest importers of North Korean coal in China. News media reporting in 2017 similarly described Dandong Chengtai (a/k/a Dandong Zhicheng) as the largest purchaser of coal from North Korea.

54.     Estimates from a confidential reliable source (CS-1), indicate that from January 2013 through February 2017, the Chi Yupeng Network of Companies imported nearly $700,000,000 worth of coal from North Korea. At prevailing market prices for North Korean coal, the value of these imports corresponds with well over ten million metric tons of coal.

B.     DANDONG ZHICHENG IS DANDONG CHENGTAI

55.     Dandong Zhicheng is known in publicly available news reporting to operate under the name of Dandong Chengtai. Corporate business registries, which collect public filings and incorporation records, and bank records reveal that Dandong Chengtai lists the same address as Dandong Zhicheng. Moreover, Dandong Chengtai previously listed its website as the Dandong Zhicheng website. News articles note that Dandong Chengtai is the "biggest buyer of coal" from North Korea, which is consistent with what law enforcement knows to be true of Dandong Zhicheng. *See Id.*

C.     DANDONG CHENGTAI'S BUSINESS MODEL

56.     In August 2010, OFAC designated Office 39 pursuant to E.O. 13551. The designation noted that Office 39 is an organization within North Korea's government that is tasked with maintaining a reserve of money for Kim Jong-un, the ruler of North Korea. In March 2016, E.O. 13722 blocked the Workers' Party of Korea. In July 2016, OFAC designated Kim Jong-un.

In the course of this investigation, the FBI obtained reliable information from Defector 1, who has first-hand knowledge of Office 39 and the Workers' Party of Korea.

57.     As noted by the United Nations, there is a "continued reliance on Chinese middlemen and cash transactions to procure commercial items for military purposes." *See* 2017 Report of the Panel of Experts, at 46. Defector 1 similarly indicated that North Korea's government attempts to operate covertly in the international financial system by relying on a relatively small group of trusted individuals who have reliably provided the North Korean government with desired services. Defector 1 revealed that Chi was one such person, who has gained a trusted position with, and maintained close ties to, the North Korean government and the North Korean military.

58.     Defector 1 further indicated that the North Korean government relies on exports of coal as its primary means of obtaining access to foreign currency. Defector 1 also stated that the North Korean military controls the amount of coal produced and its subsequent export. Further, based on Defector 1's firsthand knowledge of Office 39, law enforcement learned that Kim Jong-un puts over 95% of North Korea's foreign currency earnings generated from coal exports toward the advancement of North Korea's military, nuclear missiles and other weapons programs.

59.     Defector 1 identified Dandong Zhicheng (a/k/a Dandong Chengtai) as one of the three primary China-based importers of North Korean coal, all three of which followed the same general business patterns. These business patterns included moving coal out of North Korea and moving illegal goods – including military munitions and items – into North Korea.

60.     Defector 1 described Dandong Zhicheng (a/k/a Dandong Chengtai) as a criminal organization, which conducted illegal financial transactions and illegally paid hundreds of millions of U.S. dollars to import three to four million metric tons of anthracite coal from trade companies controlled by the North Korean military every year.

61.     Defector 1 further noted that Chinese companies, such as Dandong Zhicheng (a/k/a Dandong Chengtai), can import coal to China, but cannot legally pay North Korea for the coal in U.S. dollars due to sanctions. According to Defector 1, Dandong Zhicheng (a/k/a Dandong Chengtai) and other Chinese companies evade sanctions through multiple methods.

62.     For example, Defector 1 detailed how Dandong Zhicheng would not have to pre-pay for coal it obtained from North Korea. Instead, Dandong Zhicheng would resell the North Korean coal to customers across the world. Dandong Zhicheng would then retain the proceeds of these U.S. dollar sales, including the money owed to North Korea. The North Koreans would subsequently send payment instructions to Dandong Zhicheng for items the North Koreans would like to purchase. Dandong Zhicheng would then use the retained proceeds to purchase the items for export to North Korea. Some of these items included dual use technology. This cycle of money laundering is depicted below in Figure 1.

63.     Financial records confirm that the Chi Yupeng Network of Companies engage in transactions on behalf of North Korean interests with companies far outside of the coal industry. Specifically, financial records reveal that that the Chi Yupeng Network of Companies purchase bulk commodities such as cell phones, luxury items, sugar, rubber, petroleum products, and soybean oil, and then facilitate payment to North Korean shippers. This money laundering cycle is depicted as follows:

Figure 1 – Cycle of Dandong Chengtai Money Laundering



64.     Defector 1 indicated that another method of transferring money generated from coal imports back to North Korea included the establishment and use of systems of exchange which eliminated the need for wire transfers or cash smuggling to/from North Korea. As an example, if Chinese entity #1 owed North Korean entity #1 a certain amount of money and North Korean entity #2 owed a similar amount of money to Chinese entity #2 – Chinese entity #1 would pay Chinese entity #2, rather than North Korean entity #1; likewise, North Korean entity #2 would pay North Korean entity #1 rather than Chinese entity #2. These systems of exchange are difficult to establish, but once completed, create an efficient way to launder funds without generating records or other documentation for law enforcement to follow.

65.     As part of the investigation, the FBI interviewed a separate North Korean Defector ("Defector 2"), who is closely associated with Defector 1 and also has intimate knowledge of North

Korea's coal exports to China. Defector 2 corroborated much of Defector 1's reporting on the significance of Dandong Zhicheng in the North Korean coal trade.

66.     Financial records reveal that the Chi Yupeng Network of Companies directly or indirectly engaged in money laundering that supported the Government of North Korea or any senior official or person acting for or on behalf of that Government, and knowingly, directly or indirectly, sold, supplied, or transferred to or from the Government of North Korea or any person acting for or on behalf of that Government, a significant amount of coal for use by the Korean Workers' Party, specifically, by wiring out at least $60,000,000 in U.S. dollars subsequent to the enactment of the NKSPEA.

67.     Based on the above facts, the Chi Yupeng Network of Companies fall within the definition of foreign financial institutions under the Bank Secrecy Act, because they act as dealers of foreign exchange and money transmitters in a manner not merely incidental to their business. *See* 31 C.F.R. 1010.605(f).

68.     Financial records reveal that the Chi Yupeng Network of Companies engaged in at least $25,000,000 in wire transfers via U.S. correspondent banking transactions in spite of the section 311 action barring such transactions.

D.     DANDONG CHENGTAI'S FINANCIAL ACTIVITY DEMONSTRATES THAT IT ACTS AS A NORTH KOREAN FINANCIAL FACILITATOR

69.     Subpoena returns from U.S. financial institutions that process international wires detail wire transfers since 2009 denominated in U.S. dollars that the Chi Yupeng Network of Companies conducted from their offshore U.S. dollar accounts with a variety of entities with

established links to North Korea. These entities included other North Korean financial facilitators, shipping companies and freight forwarders, commodities brokerages, and trading companies.

70.     Many of the counterparties with which the Chi Yupeng Network of Companies transacted were entities with significant transactional histories with OFAC-designated companies and financial institutions.

71.     For example, a reliable confidential source (CS-2) revealed that the Chi Yupeng Network of Companies made illicit U.S. dollar payments for services for the benefit of the North Korean government in 2016 for more than $450,000. The Chi Yupeng Network of companies, did not seek or obtain an OFAC license to make these payments.

72.     Additionally, financial records reveal wire transfers between December 2013 and June 2017 totaling approximately $390,000 to an offshore U.S. dollar account maintained by a company that operates a North Korean flagged shipping vessel. According to publicly available GPS data, the vessel in question traveled exclusively to North Korean and Chinese ports for the prior two years.

73.     The Chi Yupeng Network of Companies also conducted a series of financial transactions with the Chinese telecommunication company ZTE Corporation ("ZTE"), which pled guilty to U.S sanctions violations in March 2017. According to an investigation led by the FBI and the Department of Commerce, ZTE was identified as having a significant trade relationship with the Korea Posts and Telecommunications Company ("KPTC"), a North Korean state-owned Telecommunications Company. KPTC utilized several intermediary companies to assist with various aspects of the business relationship with ZTE. As part of a U.S. government inquiry into ZTE's illegal business practices, ZTE allowed an independent auditing company to examine their contract management system and business records. The audit identified at least four Chinese trade

companies that were used as the intermediaries for KPTC's business with ZTE. The Chi Yupeng Network of Companies wired approximately $15.9 million to these four ZTE front companies.

74.     The above transfers are a sampling of the illicit scheme by the Chi Yupeng Network of Companies to launder U.S. dollars on behalf of sanctioned North Korean entities.

E.     CONTINUED ILLICIT U.S. DOLLAR TRANSACTIONS BY THE CHI YUPENG NETWORK INVOLVING NORTH KOREAN COAL

75.     On April 10, 2017, an individual employed by Dandong Chengtai reported to the press that Dandong Chengtai had 600,000 metric tons of North Korean coal sitting at various ports in China. According to the United Nations, the average mean price of coal per metric ton established by the Panel of Experts was $90.70 in March 2017 and $91.83 in April 2017. *See* https://www.un.org/sc/suborg/en/sanctions/1718/procurement-of-dprk-coal-by-member-states. At those rate, Dandong Chengtai would have been in possession in April 2017 of North Korean coal valued over $50,000,000.

76.     In late-March 2017, Rambo Resource, a Dandong Chengtai front company, attempted to sell North Korean coal. Specifically, on March 28, 2017, a Chinese coal trading and energy company wired three payments totaling $2,193,693.00 to Rambo Resource. The payments were transmitted through correspondent banks in the United States.

77.     The due diligence investigation revealed that the coal was of North Korean-origin. According to an invoice, this payment related to the transshipment of metric tons of coal. The coal was loaded at Taean Port, which is a port in North Korea. Further, the coal was transshipped to China on a North Korean flagged merchant vessel. This transaction reflects the Chi Yupeng Networks continued sale of North Korean coal in U.S. dollars. Due to the illicit nature of these transactions, the $2,193,693.00 was rejected.

III.   **DANDONG CHENGTAI WIRED THE DEFENDANT FUNDS TO MAISON TRADING -- A RELATED FRONT COMPANY**

78.     On or about June 21, 2017, Dandong Chengtai wired the Defendant Funds (valued at $4,083,935.00) through a foreign bank to an account held in the name of Maison Trading. Pursuant to a judicially authorized seizure warrant, the government seized the Defendant Funds as it was routing through the U.S. correspondent bank.

79.     A due diligence investigation into the transaction yielded a bill of lading and a copy of the invoice for the shipment. The proforma invoice dated March 20, 2017, indicated the total value of the contract was $8,849,709.43, which was for the purchase of 76,953.995 metric tons of coal.

80.     A stamp on the invoice revealed that a Chinese national ("Chinese Person 1"), whose name was written in Chinese characters, signed for, and on behalf of, Maison Trading.

81.     According to a reliable confidential source (CS-3), Chinese Person 1 is an employee of Dandong Zhicheng (a/k/a Dandong Chengtai). CS-3 knew Chinese Person 1 to have a management position at Dandong Zhicheng (a/k/a Dandong Chengtai). CS-3 provided the Standard Telegraphic Code (STC) [2] for Chinese Person 1, which matched the STC in the signature block on the invoice.

82.     Defector 1 also identified Chinese Person 1 as an employee of Dandong Zhicheng (a/k/a Dandong Chengtai). Defector 1 stated that Chinese Person 1 was involved in Dandong Zhicheng's (a/k/a Dandong Chengtai's) coal business and was based out of Shandong, China.

---

[2] STC is used extensively in law enforcement investigations worldwide that involve ethnic Chinese subjects where variant phonetic spellings of Chinese names can create confusion. Dialectical differences (Mr. Wu in Mandarin becomes Mr. Ng in Cantonese) and differing Romanization systems (Mr. Xiao in the Hanyu pinyin system, and Mr. Hsiao in the Wade Giles system) can create serious problems for investigators, but can be remedied by application of Chinese telegraph code.

Defector 1 also identified Chinese Person 1's phone number, which was the same number identified by CS-3.

83.     The investigation revealed that the Chi Yupeng Network of Companies utilize U.S. dollar accounts in the name of their employees and at least one relative to effectuate large wire transfers. Chinese Person 1's registration of a front company, which then received large U.S. dollar payments from Dandong Chengtai is consistent with this practice.

## IV.     SUMMARY OF FACTS GIVING RISE TO FORFEITURE

84.     The opaque U.S. dollar transactions by the Chi Yupeng Network of Companies promote IEEPA and NKSPEA violations, by preventing the imposition of sanctions. Because the Chi Yupeng Network of Companies conceal their laundering of funds for the benefit of the North Korean government and their coal sales to benefit the Workers Party, designations are impeded. Thus, the financial transactions described above facilitated a conspiracy to circumvent designations under IEEPA and NKSPEA.

85.     The proceeds of the Chi Yupeng Network of Companies' illicit coal trade, specifically, including Dandong Chengtai, generated millions of dollars of illicit proceeds, which funded additional coal purchases, including of the Defendant Property. Ultimately, the proceeds of these U.S. dollar transactions benefitted Office 39, the North Korean Workers' Party, and the North Korean military, in violation of U.S. sanctions.

86.     The Chi Yupeng Network of Companies' status as a foreign financial institution bars them from having engaged in U.S. correspondent transactions, yet they continued to do so. The Chi Yupeng Network of Companies defrauded financial institutions and conducted fraudulent wires by purporting to make their transactions appear to be divorced from the true beneficiary, North Korea entities.

## COUNT ONE -- FORFEITURE
### (Against Defendant Funds; 18 U.S.C. § 981(a)(1)(C))

87.   The United States incorporates by reference the allegations set forth in Paragraphs 1 to 86 above as if fully set forth herein.

88.   Dandong Zhicheng, Dandong Chengtai, Rambo Resource, Ruizhi Resources, Shun Mao Mining, Maison Trading, Chi Yupeng, and others, known and unknown, acted individually and conspired together to conduct the above identified illegal payments in violation of IEEPA, specifically 50 U.S.C. § 1705; and the conspiracy statute, 18 U.S.C. § 371.

89.   As such, the Defendant Funds are subject to forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(C), as property which constitutes or is derived from proceeds traceable to substantive violations of IEEPA and a conspiracy to violate IEEPA.

## COUNT TWO -- FORFEITURE
### (Against Defendant Funds; 18 U.S.C. § 981(a)(1)(A))

90.   The United States incorporates by reference the allegations set forth in Paragraphs 1 to 86 above as if fully set forth herein.

91.   Dandong Zhicheng, Dandong Chengtai, Rambo Resource, Ruizhi Resources, Shun Mao Mining, Maison Trading, and Chi Yupeng acted individually and together to transmit and transfer the Defendant Funds to a place inside the United States from or through a place outside the United States, with the intent to promote the carrying on of violations of IEEPA, 18 U.S.C. § 1343 (relating to wire fraud), and 18 U.S.C. § 1344 (relating to bank fraud), and the prohibited conduct under Section 104(a) of NKSPEA, in violation of 18 U.S.C. § 1956(a)(2)(A)).

92.   Dandong Zhicheng, Dandong Chengtai, Rambo Resource, Ruizhi Resources, Shun Mao Mining, Maison Trading, and Chi Yupeng acted individually and together to transmit and transfer the Defendant Funds to a place inside the United States from or through a place outside the United States, knowing that the funds involved in the transportation, transmission, or transfer

represented the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity, that is, violations of IEEPA, 18 U.S.C. § 1343 (relating to wire fraud), and 18 U.S.C. § 1344 (relating to bank fraud), and the prohibited conduct under Section 104(a) of NKSPEA, in violation of 18 U.S.C. § 1956(a)(2)(B)(i)).

93.     Dandong Zhicheng, Dandong Chengtai, Rambo Resource, Ruizhi Resources, Shun Mao Mining, Maison Trading, Chi Yupeng, and others, known and unknown, conspired together to commit a violation of 18 U.S.C. § 1956(a)(2)(A) and (a)(2)(B)(i), in violation of 18 U.S.C. § 1956(h).

94.     As such, the Defendant Funds are subject to forfeiture to the United States, pursuant to 18 U.S.C. § 981(a)(1)(A), as property involved in transactions in violation of 18 U.S.C. § 1956(a)(2)(A), (a)(2)(B)(i), and (h), or as any property traceable to such property.

### COUNT THREE -- FORFEITURE
**(Against Defendant Funds; 18 U.S.C. § 981(A)(1)(I))**

95.     The United States incorporates by reference the allegations set forth in Paragraphs 1 to 86 above as if fully set forth herein.

96.     The Defendant Funds are subject to forfeiture to the United States, pursuant to 18 U.S.C. § 981(a)(1)(I), as property, real or personal, that is involved in a violation or attempted violation, or which constitutes or is derived from proceeds traceable to a prohibition imposed pursuant to section 104(a) of NKSPEA.

## COUNT FOUR -- MONEY LAUNDERING MONETARY PENALTIES
### (Against Defendant Entities; 18 U.S.C. § 1956(b))

97.     The United States incorporates by reference the allegations set forth in Paragraphs 1 to 86 above as if fully set forth herein.

98.     Defendant Entities transmitted and transferred at least $100,000,000, which promoted IEEPA violative transactions.

99.     Defendant Entities transmitted and transferred at least $60,000,000, which promoted prohibited activities under Section 104(a) of NKSPEA.

100.     Defendant Entities transmitted and transferred at least $25,000,000 involving prohibited correspondent banking transactions, which promoted violations of 18 U.S.C. § 1343 (relating to wire fraud), and 18 U.S.C. § 1344 (relating to bank fraud).

101.     Dandong Zhicheng, Dandong Chengtai, Rambo Resource, Ruizhi Resources, Shun Mao Mining, Maison Trading, and Chi Yupeng acted individually and together to transmit and transfer funds to a place inside the United States from or through a place outside the United States, and to a place outside the United States from or through a place inside the United States, with the intent to promote the carrying on of violations of IEEPA, 18 U.S.C. § 1343 (relating to wire fraud), and 18 U.S.C. § 1344 (relating to bank fraud), and the prohibited conduct under Section 104(a) of NKSPEA, in violation of 18 U.S.C. § 1956(a)(2)(A)).

102.     Dandong Zhicheng, Dandong Chengtai, Rambo Resource, Ruizhi Resources, Shun Mao Mining, Maison Trading, and Chi Yupeng acted individually and together to transmit and transfer funds to a place inside the United States from or through a place outside the United States, and to a place outside the United States from or through a place inside the United States, knowing that the funds involved in the transportation, transmission, or transfer represented the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer was

designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity, that is, violations of IEEPA, 18 U.S.C. § 1343 (relating to wire fraud), and 18 U.S.C. § 1344 (relating to bank fraud), and the prohibited conduct under Section 104(a) of NKSPEA, in violation of 18 U.S.C. § 1956(a)(2)(B)(i)).

103.    Dandong Zhicheng, Dandong Chengtai, Rambo Resource, Ruizhi Resources, Shun Mao Mining, Maison Trading, Chi Yupeng, and others, known and unknown, conspired together to commit violation of 18 U.S.C. § 1956(a)(2)(A) and (a)(2)(B)(i), in violation of 18 U.S.C. § 1956(h).

104.    Accordingly, the Court should impose monetary penalties against the Defendant Entities for the value of the funds and monetary instruments involved in the transactions, in an amount to be determined at trial.

*    *    *

## PRAYER FOR RELIEF

WHEREFORE, the United States of America prays as follows:

A.      that notice issue on the Defendant Funds as described above;

B.      that due notice be given to all parties to appear and show cause why the forfeiture

should not be decreed;

C.      that a warrant of arrest *in rem* issue according to law;

D.      that judgment be entered declaring that the Defendant Funds be forfeited to the

United States of America for disposition according to law;

E.      that a monetary penalty be entered against the Defendant Entities in favor of the

United States, on a joint and several basis, in the amount of the funds and monetary

instruments involved in the transactions described above to be determined at trial;

and

F.      that the United States of America be granted such other relief as this Court may

deem just and proper, together with the costs and disbursements of this action.

Dated:  August 22, 2017
        Washington, D.C.

                              Respectfully submitted,

                              CHANNING D. PHILLIPS,
                              United States Attorney

                    By:      _____/s/_____
                              Zia M. Faruqui, D.C. Bar No. 494990
                              Christopher B. Brown
                              Ari Redbord
                              Brian P. Hudak
                              Assistant United States Attorneys
                              555 Fourth Street, N.W.
                              Washington, D.C.  20530
                              (202) 252-7566 (main line)

                              *Attorneys for the United States of America*

## <u>VERIFICATION</u>

I, Christopher Wong, a Special Agent with the Federal Bureau of Investigation, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing Verified Complaint for Forfeiture *In Rem* is based upon reports and information known to me and/or furnished to me by other law enforcement representatives and that everything represented herein is true and correct.

Executed on this <u>22th</u> day of August, 2017.


<u>        *Christopher Wong*        </u>
Christopher Wong
Special Agent
Federal Bureau of Investigation