UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>$4,083,935.00 OF FUNDS ASSOCIATED WITH DANDONG CHENGTAI TRADING LIMITED,<br><br>$500,000.00 OF FUNDS ASSOCIATED WITH CHI YUPENG,<br><br>In Rem Defendants. | Civil Action No. 1:17-01706 (CRC) |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR ENTRY OF DEFAULT JUDGMENT AS TO IN REM DEFENDANTS**

On August 22, 2017, the plaintiff United States commenced an *in rem* action against $4,083,935.00 associated with Dandong Zhicheng Metallic Material Co., Ltd. a/k/a Dandong Chengtai Trading Limited ("Dandong Zhicheng") ("Defendant Property 1"), and an *in personam* civil action against: Dandong Zhicheng; Rambo Resource Limited ("Rambo Resource"); Ruizhi Resources Limited ("Ruizhi Resources"); Shun Mao Mining Co., Limited ("Shun Mao"); Maison Trading Limited ("Maison Trading"); and Chi Yupeng (collectively, the "*In Personam* Defendants"). *See* ECF 1. On January 25, 2017, the Government amended this action to add an additional *in rem* defendant, $500,000.00 associated with Chi Yupeng ("Defendant Property 2"), (collectively, the "*In Rem* Defendants"). [1] *See* ECF 4. The action was filed pursuant to Federal Rule of Civil Procedure 55(b)(2) and 18 U.S.C. § 981(a) as to the *In Rem* Defendants, and pursuant

---

[1] The United States' motion for Default Judgment is limited to the *In Rem* Defendants. Default Judgment as to the *In Personam* Defendants is not yet ripe.

1

to 18 U.S.C. § 1956(b) as to the *In Personam* Defendants.  The United States alleges, *inter alia*, that the *In Personam* Defendants violated the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 *et seq.*, the prohibitions of the North Korea Sanctions and Policy Enhancement Act of 2016 ("NKSPEA"), 22 U.S.C. § 9201, *et seq.*, the conspiracy statute, 18 U.S.C. § 371, and the federal money laundering statute, 18 U.S.C. § 1956(a)(2)(A), (h).  Default was entered against the *In Rem* Defendants on August 28, 2018.  This matter is now ripe for entry of a default judgment; specifically, the United States requests forfeiture of the *In Rem* Defendants.

## **FACTUAL BACKGROUND**

This action arises out of an investigation by the Federal Bureau of Investigation ("FBI") into a scheme operated by the *In Personam* Defendants to launder U.S. dollars through the United States on behalf of sanctioned entities in the Democratic People's Republic of Korea ("North Korea").  On May 22, 2017, this Court found probable cause existed to conclude that the *In Personam* Defendants had illegally laundered approximately $700 million dollars for the benefit of sanctioned North Korean entities.  *See United States v. All Wire Transactions Involving Dandong Zhicheng Metallic Material Company, Ltd.*, No. 17-mj-217 (BAH), 2017 WL 3233062, at *1 (D.D.C. May 22, 2017).

On August 22, 2017, the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") designated Dandong Zhicheng.  *See* https://www.treasury.gov/press-center/press-releases/Pages/sm0148.aspx.  The designation noted that Dandong Zhicheng sold, supplied, transferred, or purchased coal or metal, directly or indirectly, from North Korea, and that the revenue may have benefitted the nuclear or ballistic missile programs of the Government of North Korea or the Workers' Party of Korea.  *See id.*  The designation also noted that Dandong Zhicheng specializes in the import, export, and transport of steel and anthracite coal,

and that it has worked with a number of U.S.-designated entities, including a North Korean bank. *See id.* The designation further stated that Dandong Zhicheng allegedly used the foreign exchange received from the end users of North Korean coal to purchase other items for North Korea, including nuclear and missile components. *See id.*

Corporate filings reveal that Chinese national Chi Yupeng ("Chi") established Dandong Zhicheng in 2005 and owns 90 percent of Dandong Zhicheng's shares. Complaint (ECF 1) at ¶ 51. Chi serves as Dandong Zhicheng's (a/k/a Dandong Chengtai's) chairman and majority shareholder. *Id.* Chi's wife, Chinese national Zhang Bing ("Zhang"), is Dandong Zhicheng's (a/k/a Dandong Chengtai's) manager. *Id.* Chi and Zhang have established and conducted business using numerous front companies, including but not limited to Tin Yee Resources, Rambo Resource, Ruizhi Resources, and Shun Mao Mining. *Id.* at ¶ 52. The establishment and use of multiple companies by the same owners/managers to facilitate business transactions allows North Korean financial facilitators to divert attention, avoid scrutiny, and launder money, all while providing them with fall back business entities in the event one of their companies is compromised. *Id.*

Dandong Zhicheng's website and its sales page were removed and/or are no longer accessible. *Id.* at ¶ 53. Prior to being removed, Dandong Zhicheng's sales page indicated that it primarily dealt in North Korean coal. *Id.* Postings on March 18, 2017, advertised the sale of North Korean coal in U.S. dollars. *Id.* Prior to being removed, Dandong Zhicheng's website, revealed that the company was one of the largest importers of North Korean coal in China. *Id.* at ¶ 54. News media reporting in 2017 similarly stated that "Dandong Chengtai" was the largest purchaser of coal from North Korea. *Id.* "Dandong Zhicheng" is know in public reporting to operate under the name "Dandong Chengtai." *Id.* at ¶ 56. "Dandong Zhicheng" and "Dandong

Chengtai" share the same office address and share the same website. *Id.* That is, "Dandong Chengtai" is an alias for "Dandong Zhicheng." *Id.*

Estimates from a confidential reliable source (CS-1), indicate that from January 2013 through February 2017, the *In Personam* Defendants imported nearly $700,000,000 worth of coal from North Korea. *Id.* at ¶ 55. At prevailing market prices for North Korean coal, the value of these imports corresponds with well over ten million metric tons of coal. *Id.*

*In Personam* Defendants' Laundering of Funds for Sanctioned Entities

In August 2010, OFAC designated Office 39 pursuant to Executive Order 13551. *Id.* at ¶ 57. The designation noted that Office 39 is an organization within North Korea's government that is tasked with maintaining a reserve of money for Kim Jong-un, the ruler of North Korea. *Id.* In March 2016, Executive Order 13722 blocked the Workers' Party of Korea. In July 2016, OFAC designated Kim Jong-un. *Id.*

In the course of this investigation, the FBI obtained reliable information from Defector 1, who has first-hand knowledge of Office 39 and the Workers' Party of Korea. *Id.* Defector 1 indicated that North Korea's government attempts to operate covertly in the international financial system by relying on a relatively small group of trusted individuals who have reliably provided the North Korean government with desired services. *Id.* at ¶ 58. Defector 1 revealed that Chi was one such person. *Id.* Defector 1 identified Dandong Zhicheng (a/k/a Dandong Chengtai) as one of the three primary China-based importers of North Korean coal. *Id.* at ¶ 60. Defector 1 described Dandong Zhicheng (a/k/a Dandong Chengtai) as a criminal organization, which conducted illegal financial transactions and illegally paid hundreds of millions of U.S. dollars to import three to four million metric tons of coal from trade companies controlled by the North Korean military every year. *Id.* at ¶ 61.

Defector 1 further noted that Chinese companies, such as Dandong Zhicheng, cannot legally pay North Korea for the coal in U.S. dollars due to sanctions. *Id.* at ¶ 62. According to Defector 1, Dandong Zhicheng and other Chinese companies evade sanctions through multiple methods. *Id.* For example, Defector 1 detailed how Dandong Zhicheng would sell North Korean coal to customers across the world. *Id.* at ¶ 63. Dandong Zhicheng would then retain the proceeds of these U.S. dollar sales, including the money owed to North Korea. *Id.* The North Koreans would subsequently send payment instructions to Dandong Zhicheng for items the North Koreans would like to purchase. *Id.* Dandong Zhicheng would then use the retained proceeds to purchase the items for export to North Korea. *Id.* Some of these items included dual use technology. *Id.*

Financial records corroborated Defector 1's statements, as these records revealed that the *In Personam* Defendants made payments to companies far outside of the coal industry, all for the benefit of sanctioned North Korean entities. *Id.* at ¶ 64. Specifically, financial records reveal that the *In Personam* Defendants purchased bulk commodities such as cell phones, luxury items, sugar, rubber, petroleum products, and soybean oil, and then facilitated payment to shipping companies known to transship goods to North Korea. *Id.* at ¶ 64. The financial records further revealed that the *In Personam* Defendants engaged in money laundering that supported the Government of North Korea and senior officials acting for and on behalf of that Government, and knowingly, sold, supplied, and transferred to and from the Government of North Korea and persons acting for or on their behalf, a significant amount of coal for use by the Korean Workers' Party, all by wiring out at least $60,000,000 in U.S. dollars payments to third parties and co-conspirators. *Id.* at ¶ 67.

For example, financial records revealed that the *In Personam* Defendants conducted a series of financial transactions with the Chinese telecommunication company ZTE Corporation ("ZTE"), which pled guilty to U.S. sanctions violations in March 2017. *Id.* at ¶ 74. According to an investigation led by the FBI and the Department of Commerce, ZTE had a significant trade relationship with the Korea Posts and Telecommunications Company ("KPTC"), a North Korean state-owned Telecommunications Company. *Id.* KPTC utilized several front companies to assist with various aspects of the business relationship with ZTE. *Id.* The *In Personam* Defendants wired approximately $15.9 million to four ZTE front companies, which payments were part of the scheme to illegally transship U.S.-origin goods to North Korea. *Id.*

Defendant Property 1

On or about June 21, 2017, Dandong Zhicheng (acting under its alias, Dandong Chengtai) wired Defendant Property 1 (valued at $4,083,935.00) through a foreign bank to an account held in the name of Maison Trading. *Id.* at ¶ 79. A due diligence investigation into the transaction yielded a bill of lading and a copy of the invoice for the shipment. *Id.* at ¶ 80. The pro forma invoice dated March 20, 2017, indicated the total value of the contract was $8,849,709.43, which was for the purchase of 76,953.995 metric tons of coal. *Id.* A stamp on the invoice revealed that a Chinese national ("Chinese Person 1"), whose name was written in Chinese characters, signed for, and on behalf of, Maison Trading. *Id.* at ¶ 81.

According to a reliable confidential source, Chinese Person 1 was an employee in a management position at Dandong Zhicheng. *Id.* at ¶ 82. The Standard Telegraphic Code ("STC") [2] provided for Chinese Person 1 by the confidential reliable source matched the STC in

---

[2] STC is used extensively in law enforcement investigations worldwide that involve ethnic Chinese subjects where variant phonetic spellings of Chinese names can create confusion. Dialectical differences (Mr. Wu in Mandarin becomes Mr. Ng in Cantonese) and differing

the signature block on the invoice. *Id.* Defector 1 also identified Chinese Person 1 as an employee of Dandong Zhicheng. *Id.* at ¶ 83. Defector 1 stated that Chinese Person 1 was involved in Dandong Zhicheng's coal business. *Id.*

The investigation revealed that the Chi Yupeng Network of Companies utilized U.S. dollar accounts in the names of their employees and at least one relative to effectuate large wire transfers. *Id.* at ¶ 84. Chinese Person 1's registration of a front company, which then received large U.S. dollar payments from Dandong Chengtai was part of the *In Personam* Defendants' money laundering conspiracy. *Id.*

Defendant Property 2

The EB-5 visa or EB-5 immigrant investor visa program provides a method for eligible immigrant investors to become lawful permanent residents (i.e., "green card holders") by investing $500,000 to finance a business in a targeted employment area in the United States that will employ at least 10 American workers. *Id.* at ¶ 85.

Chi and Zhang maintained U.S. dollar accounts in their own names at foreign financial institutions, and used these accounts to remit U.S. dollars to a bank account maintained in the United States by a family member ("U.S. Bank Account"). *Id.* at ¶ 87. Additionally, Chi utilized U.S. dollar accounts maintained by other Dandong Zhicheng employees and Chinese nationals to remit money to this account. *Id.*

In June 2016, Zhang told the U.S. Government in an interview at a U.S. immigration checkpoint that she and Chi were planning on becoming investment immigrants. *Id.* at ¶ 88. From on or about November 5, 2015, through November 13, 2015, the U.S. Bank Account

---

Romanization systems (Mr. Xiao in the Hanyu pinyin system, and Mr. Hsiao in the Wade Giles system) can create serious problems for investigators, but can be remedied by application of Chinese telegraph code.

received twelve wire transfers by twelve different individuals, ranging in values between approximately $31,335.00 and $50,000.00, for a combined total of approximately $568,405.00. *Id.* at ¶ 89. These payments were structured into smaller amounts in order to avoid foreign capital outflow restrictions imposed by the Chinese government. *Id.* at ¶ 90. On November 13, 2015, the same day as the final transfer into the U.S. Bank Account, Chi and Zhang caused a wire for $550,100.00 to be sent to a bank account ending in 2766, held by a regional EB-5 investment program ("Regional Investment Program"). *Id.* at ¶ 91. Chi and Zhang applied for an EB-5 visa and made the requisite transfer of $550,100.00 to the Regional Investment Program. *Id.* at ¶ 93. The primary address listed with this application was Suite 1801, No. 96 Jinjiang Street, Dandong, Liaoning Province, which is the address of Dandong Zhicheng. *Id.* at ¶ 74.

These U.S. dollar wires by the *In Personam* Defendants were in violation of IEEPA, the prohibitions of NKSPEA, the conspiracy statute, and the federal money laundering statute, codified at 18 U.S.C. § 1956(a)(2)(A), (h). *See* Complaint at ¶¶ 100, 101, 103-107, 109. Accordingly, the *In Rem* Defendants are subject to forfeiture, pursuant to 18 U.S.C. § 981.

## PROCEDURAL HISTORY

On August 22, 2017, the government filed its Verified Complaint for Forfeiture *In Rem*. *See* ECF 1. On August 23, 2017, the Clerk of the Court entered a Warrant for Arrest In Rem. *See* ECF 2.

On September 23, 2017, the United States commenced notification of the forfeiture action against Defendant Property 1 via publication on an internet site,

http://www.forfeiture.gov, for 30 consecutive days.[3] Claims as to Defendant Property 1 based on publication were due by November 22, 2017. *See* Supp. Rule G(5)(a)(ii); Notice of Publication (ECF 3). On January 30, 2018, the United States commenced notification of the forfeiture action against Defendant Property 2 via publication on the same internet site for 30 consecutive days. Claims as to Defendant Property 2 based on publication were due by April 2, 2018. *See* Supp. Rule G(5)(a)(ii); Notice of Publication (ECF 5). No party filed a claim based on publication, and the time to do so has expired. *See* Affidavit of Service (ECF 7).

In addition to this public notice, the United States identified potential claimants in China and the Republic of the Marshall Islands.[4] U.S. law enforcement officials effected service on those entities consistent with Chinese and Marshallese law, by sending notice via international package service on or about March 29, 2018. *See* Affidavit of Service (ECF 7). The deadline for potential claimants who received direct notice to file a verified claim was May 4, 2018. This deadline passed without any potential claimants filing a claim. *See* Affidavit of Service (ECF 7); Clerk's Entry of Default as to *In Rem* Defendants (ECF 11).

On August 27, 2018, the Clerk of the Court entered default as to the *In Rem* Defendant. *See* Clerk's Entry of Default as to *In Rem* Defendants (ECF 11); Fed. R. Civ. P. Rule 55(a) (clerk

---

[3] The Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Supplemental Rules") govern civil forfeiture actions *in rem* arising from a federal statute. *See* Supplemental Rule A(1)(B). The Federal Rules of Civil Procedure also apply, except to the extent they are inconsistent with the Supplemental Rules. *See* Supp. Rule A(2). Supplemental Rule G(4) governs the process by which the government must serve notice of the Complaint. Notice is required to the public via publication, as well as to potential claimants via direct notice. Supp. Rule G(4).

[4] Supplemental Rule G also requires that the government send direct notice "to any person who reasonably appears to be a potential claimant on the facts known to the government." Supp. Rule G(4)(b)(i).

9

must enter default when a party has failed to plead or otherwise defend). This matter is now ripe for entry of default judgment against the *In Rem* Defendants.

## STANDARDS FOR ENTRY OF DEFAULT JUDGMENT

In cases where the claim is not for a "sum certain" or a sum that can be computed with certainty, the party seeking a default judgment must apply to the court. Fed. R. Civ. P. 55(b)(2);[5] *Canady v. Erbe Elektromedizin GMBH*, 307 F. Supp. 2d 2, 8-9 (D.D.C. 2004); *United States v. Gant*, 268 F. Supp. 2d 29, 32 (D.D.C. 2003). The court has the power to enter default judgment "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend as provided by these rules." Fed. R. Civ. P. 55(a); *Int'l Painters & Allied Trades Indus. Pension Fund v. Zak Architectural Metal & Glass, LLC*, 635 F. Supp. 2d 21, 23 (D.D.C. 2009) (citing *Keegel v. Key W. & Caribbean Trading Co.*, 627 F.2d 372, 375 n. 5 (D.C. Cir.1980)). This authority applies equally in the context of a civil forfeiture action. *See, e.g., United States v. $23,000 in U.S. Currency*, 356 F.3d 157, 163 (1st Cir. 2004) (Rule 55 applies equally in the civil forfeiture context); *United States v. $6,500.00 in U.S. Currency*, No. 1:10-cv-327, 2010 WL 4365886, at *1 (E.D. Tex. Nov. 2, 2010), *report & recommendation adopted sub nom. United States v. & 6,500.00 in U.S. Currency*, No. 1:10-CV-327, 2010 WL 4365890, at *1 (E.D. Tex. Nov. 3, 2010). Default judgment is available "when the adversary process has been halted because of an essentially unresponsive party . . . [as] the diligent party must be protected lest he be faced with interminable delay and continued uncertainty as to his rights." *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir.1980) (quoting *H.F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe*, 432 F.2d 689, 691 (D.C.Cir.1970)).

---

[5] A default judgment cannot be entered against an unrepresented minor or incompetent person, *see* Fed. R. Civ. P. 55(b)(2), but neither exception applies to the *In Rem* Defendants. *See* Complaint (ECF 1) at ¶ 10.

Although there is a general policy favoring decisions on the merits, if potential claimants fail to respond to a complaint, "a decision on the merits is impractical, if not impossible." *United States v. Approximately $45,860 in U.S. Currency*, No. 14-CV-03801-JCS, 2015 WL 1387468, at *4 (N.D. Cal. Mar. 24, 2015). "A denial of default judgment would prejudice the government in that it would be required to expend further time and effort in an action where no claimants [] have appeared. Without a default judgment, the government may be without recourse altogether." *United States v. Real Prop. & Improvements Located at 929 Clay St., Unit #7, San Francisco, CA*, No. 15-CV-00010-JD, 2015 WL 3547256, at *3 (N.D. Cal. June 5, 2015).

The court's primary inquiry when considering default is whether notice has been adequately served, and if any party filed a timely claim. *See United States v. $4,620 in U.S. Currency*, 779 F. Supp. 2d 65, 67 (D.D.C. 2011) (default was appropriate because the government "provided sufficient notice of the seizure of the defendant property," and no party filed a timely claim); *see also United States v. Remington, Model 58, 12 Gauge Shotgun*, No. 1:11-CV-330, 2012 WL 1466684, at *1 (E.D. Tex. Feb. 7, 2012), report and recommendation adopted, No. 1:11-cv-330, 2012 WL 1466682 (E.D. Tex. Apr. 26, 2012) (default judgment entered upon showing government's compliance with Supplemental Rule G(4)); *United States v. 1999 Lexus GS400*, No. C 05–1139, 2007 WL 1056791, *2-3 (N.D. Cal. 2007) ("Default may be entered upon a showing that: (a) notice has been given as required by Admiralty Local Rule 6–1; (b) the time to answer has expired; and (c) no one has appeared to claim the property.").

Assuming proper notice, the court's second consideration before entering default judgment is whether the complaint establishes a reasonable belief of forfeitability. *See United States v. $1,071,251.44 of Funds Associated with Mingzheng Int'l Trading Ltd.*, No. 17-cv-01166, 2018 WL 3949962, at *4 (D.D.C. June 29, 2018) (*citing United States v. All Assets Held at Bank Julius Baer*

*& Co., Ltd.*, 571 F. Supp. 2d 1, 16 (D.D.C. 2008), report and recommendation adopted, No. 17-CV-1166, 2018 WL 3941949 (D.D.C. Aug. 15, 2018). "Default establishes the defaulting party's liability for the well-pleaded allegations of the complaint." *Boland v. Smith & Rogers Constr. Ltd.*, 201 F. Supp. 3d 144, 147 (D.D.C. 2016); *see also Int'l Painters & Allied Trades Indus. Pension Fund v. Dettrey's Allstate Painting, LLC*, 763 F. Supp. 2d 32, 34 (D.D.C. 2011) (same) (citing *Adkins v. Teseo*, 180 F.Supp.2d 15, 17 (D.D.C. 2001) (same)). A court must treat "the factual allegations in a complaint, other than those as to damages . . . as conceded by the defendant." *DIRECTV, Inc. v. Pepe*, 431 F.3d 162, 165 (3d Cir.2005); *see also Int'l Painters & Allied Trades Indus. Pension Fund v. R. W. Amrine Drywall Co., Inc.*, 239 F. Supp. 2d 26, 30 (D.D.C. 2002) (the "defaulting defendant is deemed to admit every well-pleaded allegation in the complaint" upon entry of default by the clerk) (citation omitted).

**ARGUMENT**

I. **The United States Is Entitled To Entry Of A Default Judgment Against The *In Rem* Defendants**

In this case, the Clerk of Court properly entered default against the *In Rem* Defendants, pursuant to Rule 55(a), upon the United States' showing that no party pled or otherwise defended this action. *See* Clerk's Entry of Default as to *In Rem* Defendants (ECF XX). Moreover, the well-pleaded allegations of the Complaint establish *prima facie* forfeitability of the *In Rem* Defendants, valued at $4,583,935.00.

A. <u>The United States has satisfied its notice obligations to these defendants.</u>

"Reasonable notice" requires only that the government attempt to provide actual notice, but it does not require proof that the notice was received. *See Valderrama v. United States*, 417 F. 3d 1189, 1197 (11th Cir. 2005); *United States v. Funds Up to & including the Amount of $56,634 in U.S. Currency on Deposit in Banesco Int'l, Panama*, 79 F. Supp. 3d 112, 114 (D.D.C. 2015)

(notice was adequate based on public notice on the government's forfeiture website). Where "the government attempted to provide notice and heard nothing back indicating that anything had gone awry, courts have found the government's efforts comply with due process." *Lewis v. United States*, No. 14-cv-496, 2014 WL 6065538, at *6 (S.D. Cal. Nov. 3, 2014) (citing *Jones v. Flowers,* 547 U.S. 220, 226 (2006)). *See also* Supp. Rule G(4)(b)(iv) ("[a] potential claimant who had actual notice of a forfeiture action may not oppose or seek relief from forfeiture because of the government's failure to send the required notice").

In this case, the United States satisfied its notice obligations by publishing its action on the government's forfeiture website and by mailing direct notice to all potential claimants. Additionally, this action was the subject of much international press coverage, creating a reasonable inference that the potential claimants had actual notice of the forfeiture action. *See e.g.*, https://www.reuters.com/article/us-northkorea-nuclear-forfeiture/u-s-justice-department-seeks-11-million-forfeiture-from-firms-with-ties-to-north-korea-idUSKCN1B21WC. The Clerk of Court determined that the notice requirements were satisfied when it entered default in this matter on August 27, 2018. *See* Clerk's Entry of Default as to *In Rem* Defendants (ECF 11).

B. <u>Default judgment is appropriate because the Complaint provides a well-pleaded basis for relief.</u>

The well-pleaded facts in the United States' Complaint establish a reasonable belief of forfeitability on which the Court may enter judgment. As noted above, the *In Rem* Defendants are properties associated with Dandong Zhicheng, a company which OFAC sanctioned for North Korean sanctions violations. This Court may take judicial notice of such action by OFAC. *See Youkelsone v. FDIC*, 910 F. Supp. 2d 213, 221 (D.D.C. 2012), *aff'd* 560 F. App'x 4 (D.C. Cir. 2014) ("In deciding a motion under Federal Rule of Civil Procedure 12(b)(6), a court may take judicial notice of public records from other proceedings," citing *Covad Commc'ns Co. v. Bell Atl.*

13

*Co.*, 407 F. 3d 1220, 1222 (D.C. Cir. 2005)); *see also EEOC v. St. Francis Xavier Parochial Sch.*, 117 F. 3d 621, 624 (D.C. Cir.1997) (on motion to dismiss, court may consider "matters of which [it] may take judicial notice"). Indeed, a finding by OFAC that a company has violated sanctions by financially supporting a designated entity is entitled to deference. *See In re 650 Fifth Ave.*, No. 08-cv-10934, 2013 WL 2451067, at *5–6 (S.D.N.Y. June 6, 2013). "OFAC has been delegated the authority to administer the SDN listing regime, and the Court must therefore give effect to its informal adjudications, unless they are 'plainly inconsistent' with the relevant statutes and OFAC regulations." *Id.*; *Consarc Corp. v. Iraqi Ministry.* 27 F. 3d 695, 702 (D.C. Cir. 1994), citing *Chevron U.S.A. Inc. v. NRDC,* 467 U.S. 837, 844–45 (1984). "Given OFAC's unique expertise in matters of terrorist finance and the sensitive nature of the investigations upon which OFAC makes its determinations, it is entitled to deference even greater than that afforded an administrative agency statutory interpretation under *Chevron.*" *In re 650 Fifth Ave.*, 2013 WL 2451067, at *5–6; *see also Holy Land Found. for Relief & Dev. v. Ashcroft,* 219 F. Supp. 2d 57, 68 (D.D.C. 2002) *aff'd,* 333 F. 3d 156 (D.C. Cir. 2003) (OFAC interpretation of "legally enforceable interest" entitled to deference). OFAC's designation of Dandong Zhicheng, which should receive such deference, creates a factual predicate for a reasonable belief that Dandong Zhicheng and its associated entities acted exclusively for the benefit of sanctioned North Korean entities.

Moreover, the facts, which must be taken to be true, sufficiently plead a reasonable belief of forfeitability, because the United States has specified:

- the perpetrators of the IEEPA, NKSPEA, and money laundering conspiracy (Chi and his related companies), *see e.g.,* Complaint (ECF 1) at ¶ 50;
- the victim of the conspiracy (the United States), *see e.g., Id.* at ¶ 33;

- the goal of the conspiracy (to allow sanctioned North Korean entities to launder the proceeds of their coal sales via Chi and his related front companies which made payments for the North Korean entities in U.S. dollars, in spite of sanctions preventing them from doing so), *see e.g.,* ¶¶ 61-69;

- the means of effectuating the goals (wire payments to specific counterparties), *see e.g.,* ¶¶ 67, 69; and

- which members of the conspiracy were responsible for which acts (Chi and his companies for acting as North Korean financial facilitators and laundering payments to third parties), *see e.g.,* ¶¶ 61-69.

*See All Assets Held In Account No. XXXXXXX*, 83 F. Supp. 3d at 373 (complaint sufficiently pled a reasonable belief of forfeitability, because the government specified the victim of the alleged fraud; the perpetrators of the alleged fraud; the goal of the fraud; the means of effectuating the fraud; and which members of the fraud were responsible for which acts).

This Court has already found by *probable cause*, a much higher standard than the reasonable belief required here, that all funds transacted by the *In Personam* Defendants are subject to forfeiture. *See Dandong Zhicheng*, 2017 WL 3233062, at *5 (affidavit established probable cause to believe that the any and all U.S. dollar wires conducted by *In Personam* defendants were subject to forfeiture based on violations of the money laundering statute and IEEPA, and the prohibitions of NKSEPA, because the transactions being routed through U.S. correspondent banks were consistent with generalized patterns of North Korean money laundering activities, and because the government catalogued numerous transactions between the target company and other entities known to conduct business with or on behalf of North Korea). In *Dandong Zhicheng*, this Court accepted a counterparty analysis – that is by showing consistent transactions with North

Korean financial facilitators (even pre-designation) – to conclude that the government establish IEEPA and money laundering violations, which encompassed the entire business for the *In Personam* Defendants. *See id.* Thus, the *In Rem* Defendants are subject to forfeiture pursuant to this finding. *See id.*

Taking the facts of the Complaint as true, the United States has independently established that: the *In Personam* Defendants entered into an agreement among themselves and with other parties known (i.e., Office 39) and unknown to commit offenses (i.e., IEEPA, NKSPEA, conspiracy to commit offenses and defraud the United States, and the money laundering statute) against the United States; and that the *In Personam* Defendants' surreptitious activities (i.e., overt acts), including its use of multiple front companies, its transactions with North Korean financial facilitators such as ZTE, and concealment of North Korea as the true beneficiary of its wire payments demonstrate the *In Personam* Defendants' knowledge that its agreement was for an unlawful purpose. Thus, the United States has established a violation of the conspiracy statute, 18 U.S.C. § 371, and the money laundering conspiracy statute, 18 U.S.C. § 1956(h). *See United States v. Trie*, 23 F. Supp. 2d 55, 59 (D.D.C. 1998) ("The essential elements of a conspiracy charge are (1) an agreement among two or more persons, (2) either to commit an offense against the United States or to defraud the United States, (3) with knowledge of the conspiracy and with actual participation in it, where (4) one or more of the co-conspirators takes any overt act in furtherance of the conspiracy."); *United States v. Cobble*, No. 13-cr-200 (RWR), 2015 WL 5173887, at *2 (D.D.C. Sept. 2, 2015) (government must show defendant: "(1) agreed to commit a money laundering offense, and (2) knowingly and voluntarily participated in that agreement.") (internal citation omitted).

Moreover, the facts of the Complaint satisfy the elements of a civil IEEPA forfeiture claim. The *In Personam* Defendants wired hundreds of millions of U.S. dollars, which transited through the United States, for the benefit of sanctioned North Korean entities, without having first obtained a license from OFAC, knowing that such license was needed. The *In Personam* Defendants' knowledge is again demonstrated by their activities to conceal the true nature of their transactions (i.e., establishing and using front companies, transacting with North Korean financial facilitators, and concealing the true beneficiary of their wire payments). Such actions violate IEEPA. *See United States v. Quinn*, 403 F. Supp. 2d 57, 65 (D.D.C. 2005) (elements of IEEPA are: (1) an illegal export or provision of services; (2) failure to obtain the necessary license from OFAC; (3) the defendant acted knowingly and willfully; and (4) the defendant knew that a license was required). The bar for the forfeiture of proceeds of an IEEPA violation is lower in the civil context, as willfulness is not a civil element. *See United States v. All Funds on Deposit in United Bank of Switzerland*, 2003 WL 56999, at *6-7 (S.D.N.Y. Jan. 7, 2003) (J. Rakoff) (willfulness not required in civil forfeiture of IEEPA proceeds). This is because the definition in 18 U.S.C. § 1956(c)(7)(D), which incorporates forfeiture, ties IEEPA to violations of "section 206," which incorporates both civil and criminal violations of IEEPA. Section 206 states that while criminal violations of IEEPA require willfulness, civil violations do not.

18 U.S.C. § 981(a)(1)(C) mandates the forfeiture of property derived from or constituting proceeds of violations of Section 206 of IEEPA (which is defined as a specified unlawful activity in 18 U.S.C. § 1956(c)(7)(D)) and for a conspiracy to violate such law. The *In Personam* Defendants caused the wiring of Defendant Property 1, which transited through the United States, for the benefit of sanctioned North Korean entities. Thus, Defendant Property 1 constitutes the proceeds of an IEEPA violation and a conspiracy to violate IEEPA. Chi caused the wiring of

Defendant Property 2, which transited through the United States. The investigation revealed that Chi's sole source of income was from the hundreds of millions of dollars he laundered for the benefit of sanctioned North Korean entities. Thus, Defendant Property 2 is property derived from the proceeds of Chi's IEEPA violations and a conspiracy to violate IEEPA. *See In re 650 Fifth Ave. & Related Props.*, 777 F. Supp. 2d 529, 564-66, 566 n.11 (S.D.N.Y. 2011) (to the extent that a building was improved and maintained with proceeds of an IEEPA violation, the building is forfeitable, at least in part, as property traceable to the offense); *United States v. $688,670.42 Seized From Regions Bank Account*, 759 F. Supp. 2d 1341, 1347 (N.D. Ga. 2010) (checks derived from fraud scheme remain subject to forfeiture even after they are cashed by a check casher and deposited into the check casher's account, following *United States v. $4,255,000, 725 F.2d 895 (11th Cir. 1985)); United States v. U.S. Currency in the Amount of $43,920.00*, 2010 WL 1486005, *3 (W.D. Mo. Apr. 14, 2010) (if defendant uses his fraud proceeds to gamble, any gambling winnings are traceable to the fraud proceeds, following *U.S. v. Betancourt*, 422 F.3d 240, 251-51 (5th Cir. 2005) (if drug dealer had no legitimate income, winning lottery ticket is traceable to his drug proceeds)).

The substantive money laundering claims are similarly sufficiently pled. To prove a violation of 18 U.S.C. § 1956(a)(2)(A), the government must show the movement of funds across the border of the United States, which promoted the carrying on of a specified unlawful activity (i.e., IEEPA and NKSPEA). *See United States v. Piervinanzi*, 23 F.3d 670, 680 (2d Cir. 1994). The United States need not prove that the funds involved in the transaction are illicit, because Congress excised the term "proceeds" from this provision. *See id.* Section 981(a)(1)(A) (money laundering forfeiture authority) "provides, therefore, for broader forfeiture than 18 U.S.C. 981(a)(1)(C), the IEEPA forfeiture provision. If entitlement to forfeiture is shown under this

section, then 'any property' 'involved in' or 'traceable to' the violation is subject to forfeiture." *In re 650 Fifth Ave.*, No. 08.-cv-10934, 2013 WL 5178677, at *30 (S.D.N.Y. Sept. 16, 2013), *vacated and remanded sub nom. on other grounds* (*In re 650 Fifth Ave. & Related Properties*, 830 F.3d 66 (2d Cir. 2016)). The *In Rem* Defendants are funds involved in the *In Personam* Defendants' scheme to launder money through the U.S. financial system.

The NKSPEA forfeiture claims are similarly sufficiently pled. 18 U.S.C. § 981(a)(1)(I) subjects to forfeiture: (1) proceeds traceable to a prohibition imposed pursuant to section 104(a) of NKSPEA; and (2) a broader category of "involved in" funds for violations of NKSPEA. *See. Dandong Zhicheng*, 2017 WL 3233062, at *6 n.5. Thus, the proceeds of prohibited activity are subject to forfeiture, even where a violation of NKSPEA has not occurred. *See id.* Section 104(a) of NKSPEA includes ten categories of prohibited activities, including:

- knowingly, directly or indirectly, engaging in money laundering that supports the Government of North Korea or any senior official or person acting for or on behalf of that Government, 22 U.S.C. § 9214(a)(6); and

- knowingly, directly or indirectly, selling or supplying or transferring to or from the Government of North Korea or any person acting for or on behalf of that Government, a significant amount of coal for use by the Korean Workers' Party. 22 U.S.C. § 9214(a)(8).

The facts, including reliable testimony from Defector 1 revealed that the coal sales and related money laundering activities by the *In Personam* Defendants were for the benefit of the Government of North Korea and the Workers' Party. *See* Complaint (ECF 1) at ¶ 67; *see also* https://www.treasury.gov/press-center/press-releases/Pages/sm0148.aspx (OFAC designation of Dandong Zhicheng notes that its illicit activities were for the benefit of the Government of North Korea and the Workers' Party).

## **CONCLUSION**

For the foregoing reasons, and, upon consideration of the record in this case, including a showing of compliance with applicable rules regarding service of process and notice by publication, the default entered by the Clerk of the Court, and taking the well-pleaded allegations of the Complaint as true, the United States respectfully requests that its motion for entry of default judgment be granted. *See 8 Gilcrease Lane*, 638 F.3d at 299 (upholding district court's order for default judgment and final order of forfeiture, because there were no valid claims); *United States v. $9,928.00 in U.S. Currency*, 10-cv-1728, 2012 WL 1004873, at *1 (D.D.C. Mar. 27, 2012) (ordering default where government submitted affidavit certifying that it gave appropriate notice and that no claims were filed); *United States v. $4,620 in U.S. Currency*, 779 F. Supp. 2d 65, 67 (D.D.C. 2011) (ordering default where court struck sole claimant's claim, leaving no claimants to the defendant funds). As reflected in the proposed order accompanying the Motion, the United States asks specifically that the Court order the *In Rem* Defendants, valued at $4,583,935.00, be forfeited to the United States.

Respectfully submitted,

JESSIE K. LIU, D.C. Bar No. 472845
United States Attorney for the District of Columbia

By:   /s/
Zia M. Faruqui, D.C. Bar No. 494990
Assistant United States Attorney
555 Fourth Street, N.W.
Washington, D.C. 20530
(202) 252-7117
zia.faruqui@usdoj.gov

August 30, 2018                          *Attorneys for the United States of America*